[No. 29919.   Department Two.   August 29, 1946.]

EMIL MUTTI, *Appellant*, v. BOEING AIRCRAFT COMPANY, *Respondent*.[1]

[1]Reported in 172 P. (2d) 249.

*Little, Leader, LeSourd & Palmer,* for appellant.

*Brethorst, Holman, Fowler & Dewar,* for respondent.

JEFFERS, J.—On or about June 1, 1945, plaintiff, Emil Mutti, instituted an action in the superior court for King county against Boeing Aircraft Company, a corporation, to recover damages for injuries alleged to have been received by him during the noon rest period on February 18, 1943, when an XB-29 Flying Fortress crashed into the plant of Frye & Company, in Seattle, Washington.

The original complaint was based on the theory of negligence and alleged facts tending to show that plaintiff was not in the course of his employment at the time he was injured.

Defendant filed an answer to the complaint, in which it denied the claimed acts of negligence. It then set up an affirmative defense in which it is alleged, in substance, that, at the time of the accident, plaintiff was an employee of Frye & Company and was engaged in extrahazardous employment under the workmen's compensation act; that defendant had contributed to the workmen's compensation fund on all its employees who were engaged in extrahazardous work, including all test pilots; and that defendant was covered by the act. It was further alleged that on February 18, 1943, Frye & Company was a contributor to

the workmen's compensation fund, and that, at the time of the accident, plaintiff was in the course of his employment and is precluded by the act from maintaining a common-law action for negligence. Plaintiff, by his reply, denied the material affirmative allegations of defendant's answer.

On November 15, 1945, the following stipulation was filed in the cause:

"It is hereby stipulated and agreed by and between the parties hereto, through their respective attorneys, that the plaintiff may amend his complaint by inserting in said complaint at the close of paragraph II, paragraph II-A reading as follows:

" 'II-A

" 'That at all times herein mentioned there was and now is in full force and effect those certain air traffic rules known as 14 Code Federal Regulations, Part 60 Air Traffic Rules issued May 31, 1938 by the Secretary of Commerce as amended, pursuant to authority contained in Sec. 3, 44 Stat. 569, 570, 45 Stat. 1404, 48 Stat. 1114; also Stat. 984, 985, 1007-1011, 1026 as amended; 49 U. S. C. 173; 49 U. S. C. 425, 551-557, 672.

" 'Said air rules were adopted by the Legislature of the state of Washington pursuant to § 2722-5, Rem. Rev. Statutes of the state of Washington.'
and by inserting at the close of paragraph VII, Paragraph VIII reading as follows:

" 'VIII

" 'In the event it be found as a fact that the plaintiff was injured by an industrial accident and was injured in the course of his employment, plaintiff further alleges without prejudice to his previous common law right of action, that prior to the commencement of this action and on or about the 10th day of April, 1945, he delivered and caused to be delivered to the department of labor and industries, notice of his election (pursuant to § 7675 Rem. Rev. Stat.) not to take under the workmen's compensation act of the state of Washington but an election to seek a remedy against the Boeing Aircraft Company for all injuries and damages sustained by him on February 18, 1945 when the flying fortress crashed into the Frye packing plant, injuring the plaintiff.

" "That a copy of said notice of election is hereto attached, marked exhibit "B" and by reference made a part of this complaint.'

"It is further stipulated that all the allegations in said paragraphs II-A and VIII may be deemed denied without further answer on behalf of the defendant."

The cause came on for hearing before the court and jury on November 26, 1945. At the close of plaintiff's case, defendant interposed the following motion:

"MR. BRETHORST: May it please the court, comes now the defendant Boeing Aircraft Company and moves for a judgment of dismissal of the complaint and a judgment of nonsuit, on the following grounds and for the following reasons:

"One, is that the evidence introduced by the plaintiff does not sustain the allegations of his complaint.

"The second, is that the plaintiff has failed to produce any evidence of negligence whatsoever on the part of the defendant Boeing Aircraft Company or of any of its employees.

"And three, for the reason that the plaintiff was at the time of the accident in the course of his employment and engaged in extrahazardous work; that the defendant's agents were in the course of their employment and engaged in extrahazardous work; that Frye & Company and the defendant Boeing Aircraft Company were contributors to the workmen's compensation fund and were engaged in extrahazardous work; therefore, that the defendant Boeing Aircraft Company is immune to a suit by the plaintiff.

"And four, that even though the defendant Boeing Aircraft Company was not covered by the industrial insurance act of the state, the plaintiff elected to take from the state department of industrial insurance and, therefore, cannot recover against the defendant in this suit."

On December 10, 1945, the trial court made and entered the following judgment of dismissal:

"Be it remembered that the above-entitled case came on for trial in open court before the undersigned judge on the 26th day of November, 1945, the plaintiff being present and represented by his attorneys, Messrs. Little, Leader, LeSourd & Palmer, and the defendant being represented by its officers and agents and its attorneys, Messrs. Brethorst, Holman, Fowler & Dewar; and both parties having an-

nounced themselves ready for trial, the court heard the evidence submitted by the plaintiff, and after the plaintiff had announced through his attorneys that his case was closed, counsel for defendant moved the court for a nonsuit and a dismissal of the plaintiff's cause of action with prejudice; and the court having heard argument of counsel and having rendered an oral opinion giving its reason for granting the defendant's motion for a judgment of nonsuit, and the court being fully advised in all the facts and the premises, does here and now ORDER, ADJUDGE AND DECREE:

"First. That the motion of the defendant for nonsuit and for a dismissal of the plaintiff's complaint with prejudice be, and the same is hereby, granted.

"Second. That the complaint of the plaintiff be, and is hereby, dismissed with prejudice, and the defendant be, and it is hereby, granted judgment against the plaintiff for its attorneys' fees and disbursements in the sum of Twenty-six and 50/100 Dollars ($26.50).

"Third. The motion of the plaintiff for a new trial be, and it is hereby denied.

"To all of which the plaintiff excepts and his exception is allowed."

Plaintiff has appealed from the above judgment, and makes the following assignments of error: (1) that the court erred in holding that appellant was in the course of his employment; (2) that the airplane crash was an occupational hazard of appellant; (3) that appellant had not made a timely election under the workmen's compensation act; (4) that respondent's test pilots were covered by the workmen's compensation act; (5) that respondent was not liable in tort or guilty of negligence; (6) in granting respondent's nonsuit and entering judgment of dismissal; and (7) in overruling appellant's motion for a new trial.

At the close of appellant's case, the trial court rendered an oral decision, which has been transcribed and made a part of the statement of facts. In this opinion, the trial judge discussed at length the issues presented as they appeared to him and stated his conclusions, in some instances citing the authority relied upon.

May we say here, in fairness to the trial court, that, at the time this case was tried and the judgment entered, the case of *D'Amico v. Conguista,* 24 Wn. (2d) 674, 167 P. (2d)

157, to which we shall later refer, had not been decided.

It is apparent from the court's oral decision that respondent, as well as appellant, was of the opinion that the primary question to be determined was whether or not appellant, at the time he was injured, was in the course of his employment. We quote from the decision:

"The defendant among other things contends primarily that the plaintiff was an employee of Frye & Company at the time, engaged in extrahazardous employment; that at the particular time of the injury he was in the course of employment for his employer, and is covered by the workmen's compensation act; further, that all of the employees of Boeing Aircraft Company in the plane were likewise covered by the workmen's compensation act; and that, therefore, the plaintiff has no common law action against the third party, the defendant Boeing Aircraft Company."

The trial court, in answering this question, stated:

"A workman is in the course of employment under the act, in my opinion, during the lunch hour if he remains upon the premises of his employer; and it is immaterial that the employer pays no premiums to the fund for that period or that he receives no pay therefor."

The court then cited the cases of *Welden v. Skinner & Eddy Corp.*, 103 Wash. 243, 174 Pac. 452, and *White v. Shafer Bros. Lbr. & Door Co.*, 165 Wash. 298, 5 P. (2d) 520, 8 P. (2d) 1119; 71 C. J., p. 662 and other pages; and cases from other jurisdictions.

The court concluded its discussion with the following statement:

"I first discussed the question of negligence of the Boeing Aircraft Company, the defendant, and also the question of the doctrine of *res ipsa loquitur;* but my disposition of this motion makes it unnecessary for me, and I shall not pass upon those two questions. I am of the opinion that the evidence and testimony and the facts in this case before the court show conclusively as a matter of law that the plaintiff at the time of his injury was under the provisions of the workmen's compensation act; that likewise the eleven employees of the defendant Boeing Aircraft Company were under the provisions of the workmen's compensation act; that both were engaged in extrahazardous industries; that

for that reason the plaintiff has no common law right of action against the defendant and the case should be dismissed."

The jury was then called in, and the trial court, in explaining to the jury the situation as it appeared to him, stated that appellant must take whatever benefits he is to receive under the provisions of the act, no matter how much or how little the benefits might be.

It seems to us the primary question to be decided is whether or not appellant, at the time he was injured, was in the course of his employment, under the provisions of the workmen's compensation act, for if it be decided that he was not, it is apparent that the trial court erred in granting respondent's motion and a new trial must be granted; and if appellant was not in the course of his employment at the time he was injured, a common-law action for negligence would lie and appellant would have no rights under the workmen's compensation act, and could make no election as between a right to proceed under the act or bring a common-law action for negligence.

We shall, then discuss the question of whether or not the trial court erred in holding, as a matter of law, that appellant was in the course of his employment at the time he received the alleged injuries. It is stated by appellant in his brief that he was not injured while in the course of his employment, for the following reasons: (1) that he was not at his place of work; (2) that he was injured on his own time when he was free to go where he pleased, and at a time when his employer had no control over him; (3) that he was not being paid for the half-hour rest period during which time he was injured; (4) that no assessments were being paid by his employer to the industrial insurance fund for this half-hour; and (5) that he was not engaged in any act pertaining to his work, but was on a mission of his own to get his war savings bond, solely for his own benefit, at a time most convenient to himself.

A challenge to the sufficiency of the evidence, or a motion for nonsuit, admits the truth of the plaintiff's

evidence and all inferences which reasonably can be drawn therefrom, and requires that the evidence be interpreted most strongly against the defendant, and in the light most favorable to plaintiff. In the determination of such challenge or motion, even though the plaintiff's evidence is in some respects unfavorable to him, he is not bound by the unfavorable portion of such evidence, but is entitled to have his case submitted to the jury on the basis of the evidence which is most favorable to his contention. *Lindberg v. Steele*, 5 Wn. (2d) 54, 104 P. (2d) 940.

It conclusively appears from the testimony that appellant was severely injured at 12:28 p. m., on February 18, 1943, when a B-29 Fighting Fortress, operated by employees of respondent and in charge of test pilot Eddie Allen, struck the plant of Frye & Company, in Seattle, Washington.

Appellant had been employed by Frye & Company, at its Seattle plant, since 1921. His usual place of work was on the fourth, or beef-killing, floor, and that was where he had been working during the forenoon of February 18, 1943. His hours of work were from eight a. m. to twelve noon, and from twelve-thirty p. m. to four-thirty p. m. The half-hour from twelve to twelve-thirty p. m. was appellant's lunch period.

Miss Benson, secretary to the president of Frye & Company, and who had charge of the payroll records, testified that appellant was receiving ninety-seven cents an hour on the day of the accident.

Mr. Romanoff, plant superintendent for Frye & Company, testified that the men were not paid for the half-hour lunch period, and that during the rest or lunch period the men were absolutely free; that some of them would go across the street to the Blue Bird restaurant to get their lunch, some would eat in their cars, and some would eat in the rooms where they were working. It also appears from the testimony that Frye & Company paid no premiums or assessments to the medical aid fund or accident fund of the department of labor and industries for the half-hour lunch period.

On the day of the accident, appellant ate his lunch in the tank room, which is on the same floor and adjoining the room in which he worked.

The testimony of Miss Benson, hereinbefore referred to, shows that Frye & Company, at the request of the government and for the accommodation of its employees, would purchase anywhere from nine to twelve thousand dollars worth of defense bonds, for which it paid cash. These bonds were sent to Frye and Company in blank, so far as the named owner was concerned, and were kept by the company in its main office, which was about two hundred yards from the foot of the stairs leading down from the fourth floor. When an employee desired to procure a bond, he made application to the company. No charge was made by Frye & Company for this service either to the employee or the government, the service being furnished as a matter of convenience to the employee.

On December 30, 1941, appellant made a written application for bonds and authorized respondent to deduct from his salary $2.50 per week, beginning January 10, 1942, and when a sufficient amount had accumulated, to purchase a United States defense savings bond. Pursuant to the above application, appellant purchased bonds, which he would get at the main office during the half-hour lunch period, when notified that a bond was there for him. When the men called for their bonds, the desired name or names would be inserted therein.

In accordance with the above application and practice, a bond was issued to appellant on February 17, 1943, the day before the accident. Appellant's payday was on Wednesday of each week, and he testified that he always went to the timekeeper's office to get his pay around twenty or twenty-five minutes after twelve. As stated, appellant testified he always went to get his bond during the lunch period.

In answer to questions propounded to him, appellant testified as follows:

"Q. What time did you go to work on February 18, 1943? A. 8:00 o'clock. Q. When you came in that morning, what

did you find, if anything? A. I find on timekeeper card, piece of paper. He say, 'Come to office. Come get your defense bond.' Q. Calling your attention to plaintiff's exhibit 17 (indicating), you see that slip of paper? A. Yes. I find that February 18. Q. That slip? A. That's it. That's right. That is my name. That is my name, sure."

The slip referred to (exhibit 17) states:

"Name Emil Mutti
"Please call at office for U. S. Defense Bond."

Appellant's testimony continues:

"Q. (by Mr. Leader) Mr. Mutti, what time you go to work that morning? A. 8:00. Q. And where do you go then? A. First I have to go to dressing room. Q. Then where? A. And after I go on fourth floor. Q. Is that where you work? A. Fourth floor, yes. Q. What did you do with your lunch bucket? A. I leave my lunch bucket in the tank room. Q. Where you eat your lunch that day? A. In the tank room. Q. After you eat your lunch, where you go? . . . [Question repeated] A. After I go downstairs in office, get my defense bond. . . . Q. When you go downstairs, is there any door you go through? A. You have to go through the door. The door is open all the time. Q. What side of the building? A. On the left side, south. Q. South. How far from the door, about, you eat your lunch? A. About twelve feet, maybe more. Q. Then you went through the door, I understand? A. Through the door. . . . Q. After you went out the door, where you go? A. On the balcony. Q. And from there, where? A. Downstairs. Q. How far is from the door to the stairs, about? A. Oh, about twelve feet, maybe more. Q. When the plane hit the Frye packing plant, where were you? A. I start downstairs. I put my foot on the step. After I don't remember. . . . Q. What days were you paid? A. Payday is Wednesday. Q. When would you go down to get your pay, what time of day? A. Oh, around 20, 25 minutes after 12:00. Q. What office would you get your pay check? A. Check? In timekeeper office. Q. When you got your bond, what office would you go to? A. I have to go to the main floor. Q. Is that the same office? A. No, not the same office. Main floor is cashier; and time-keeper office is different. Timekeeper office is close to the dressing room. . . . Q. Did you always get your bond during the lunch— A. All the time."

February 18, 1943, was Thursday. Appellant testified that, on the week of the accident, he got his pay check on Wednesday, the day before the accident.

On cross-examination, appellant was interrogated relative to answers made by him in a deposition taken on November 2, 1945. The purpose of the questions was apparently to bring out that appellant had stated in that deposition that he ate his lunch and was still in the tank room on the fourth floor at the time the plane struck the plant. It is apparent that all through appellant's testimony it was difficult to make him understand the questions, and the answers made in that part of the deposition read into the record are a little confusing, but we are satisfied that appellant did not intend to state that he was in the tank room at the time he was injured. We quote the last question and answer appearing in the record, as read from the deposition:

" 'Q. And you were still in the tank room? A. No, no. I was downstairs. I put my foot on the stairs and after that I don't remember, see.' "

It appears that the company blew a warning whistle at 12:27. Appellant was asked where he was when this warning whistle blew, and answered that he did not know.

It appears quite conclusively that, in order to reach the cashier's office on the main floor, one would follow a different route than in going to the timekeeper's office.

Appellant testified that there was a clock in the tank room where he ate his lunch; that the last time he saw the clock as he was leaving to get his bond, it was twenty-five minutes after twelve.

Appellant further testified that, when he got the slip (exhibit 17) in the morning, he put it in his pocketbook and then put the pocketbook in his overalls; that he had the pocketbook with him when he started to go after his bond. This pocketbook and slip were found by Paul Mutti, appellant's brother, on the dresser in appellant's room at the hospital on the day of the accident.

Miss Benson testified that, when an employee came to get his bond, she did not pick up the notice slip, but all an

employee did was to show it to the cashier. Miss Benson further testified that the bond issued to appellant on February 17, 1943, was picked up in the office by George Mills, one of Frye & Company's employees, and delivered to the hospital on August 18, 1943.

The only intimation in this record that appellant, at the time he was injured, was not on the stairs leading down from the fourth, or beef-killing, floor, is found in the testimony of Mr. Baird, who was in the beef-killing room at the time the plane struck the plant. He tried to get out of that room, ran out on the balcony, and started down the steps, but found them so hot that he turned back and eventually jumped out of a window. He stated that he saw no one on the stairs. This witness further testified that there was plenty of smoke and fire everywhere and that he tried to protect his face and eyes. He stated that "naturally you would cover your face up with your arms, like that (indicating)." He further stated that that was how he got so badly burned on the arms.

"Q. Do you think that if there had been a man there on the fourth floor that day, you would have seen him? A. Absolutely not."

We are of the opinion that the testimony almost conclusively shows that, at the time appellant was injured, he had finished his lunch and had started down the stairs to get his bond at the cashier's office. It is our opinion that, in going down to get this bond during the lunch period, when he was absolutely free to go where he pleased, and not under the control of his employer, he was proceeding upon a venture of his own, which was in no way connected with the duties required of him by his contract of employment, but which was solely for his own benefit and of no benefit to his employer. Appellant was not being paid for the half-hour lunch period, nor were any premiums or assessments being paid by the employer to the department of labor and industries for this half-hour. At the time he was injured, he was going away from his place of work.

Under the facts in this case, we are of the opinion that the trial court erred in holding as a matter of law that ap-

pellant was in the course of his employment at the time he was injured, and in granting respondent's motion. Our conclusion is based upon the rules announced in the case of *D'Amico v. Conguista, supra,* decided March 19, 1946, and *Purinton v. Department of Labor & Industries, ante* p. 364, 170 P. (2d) 656.

We have had before us two so-called noon hour cases, namely, *Young v. Department of Labor & Industries,* 200 Wash. 138, 93 P. (2d) 337, 123 A. L. R. 1171, and the *D'Amico* case, *supra.* While the *Purinton* case, *supra,* is not a noon hour case, it deals directly with the question herein discussed and affirms the rules laid down in the *D'Amico* case.

As hereinbefore stated, at the time the judgment was entered in the instant case, neither the *D'Amico* case nor the *Purinton* case had been decided, and the trial court had before it for consideration only the *Young* case, *supra,* and other cases decided by this court prior thereto.

The greater part of the cases cited by respondent to sustain its contention that appellant was in the course of his employment at the time he was injured were considered in the *D'Amico* case, certainly all the cases which had been decided by this court. However, regardless of what may have been said by this court prior to the *D'Amico* case, the majority opinion in the *D'Amico* case lays down certain rules, and specifically holds that certain facts must be shown to exist before it can be held that an employee is in the course of his employment under the workmen's compensation act.

The *D'Amico* case was a common-law action for negligence, brought by Mary D'Amico, as administratrix and personally, against Joe Conguista *et al.* The defendants (appellants) in their answer set up as an affirmative defense that, at the time and place of the accident, D'Amico (who was killed) was engaged in extrahazardous employment and was in the course of his employment; that defendants were likewise engaged in extrahazardous employment, all within the meaning of the workmen's compensation act of the state of Washington; that, by the provisions of the

act, plaintiff's exclusive remedy was against the industrial insurance fund established by law. It is stated in the opinion:

"It is conceded that D'Amico worked by the hour and that his employer had no control over him during the noon rest period. It is also admitted that he worked on eight hour shifts, from eight to twelve, and from twelve-thirty to four-thirty, and that he was not paid for the thirty minutes allowed for lunch. In addition, it is conceded that no money was paid to the Washington compensation fund for the noon hour period.

"The first question for consideration is whether D'Amico, at the time he was injured, was *working* in the course of his employment so as to bring him within the provisions of the workmen's compensation act. If D'Amico was a workman, as that term is defined by our statute, at the time he was injured his administratrix cannot maintain this action." (Italics ours.)

The opinion further states:

"On the other hand, respondent takes the position that D'Amico was not injured while in the course of his employment, in that *he was not at his place of work. He was not injured while he was working,* but was injured *while on his own time,* when he was free to go where he pleased, and at a time when his employer had no control over him. Further, *that he was not being paid for the half-hour period which included the time of his injury, that no assessment was being paid by his employer to the industrial fund for this half hour,* and that he was not engaged in any act pertaining to his work." (Italics ours.)

The opinion then states:

"Under our workmen's compensation act, *definite conditions* must exist at the time of an injury *in order to entitle one to the benefits of the act.* First, the relationship of employer and employee must exist between the injured person and his employer (except in some cases where the injured person is an independent contractor); second, the injured person must be in the course of his employment; third, that the employee must be in the *actual performance* of the duties required by the contract of employment; and, fourth, the work being done must be such as to require payment of industrial insurance premiums or assessments." (Italics ours.)

The opinion then quotes from the case of *Young v. Department of Labor & Industries,* 200 Wash. 138, 93 P. (2d) 337, the following test to be used by the court in determining whether an employee is, at a given time, in the course of his employment:

" 'The test adopted by this court for determining whether an employee is, at a given time, in the course of his employment, is whether the employee was, at the time, engaged in the performance of the duties required of him by his contract of employment, or by specific direction of his employer; or, as sometimes stated, *whether he was engaged at the time in the furtherance of the employer's interest.* [Citing authority.]' " (Italics ours.)

None of the conditions required by the opinion in the *D'Amico* case to be shown were established in the instant case, except that appellant was an employee of Frye & Company. At the time appellant was injured, he was not engaged in the actual performance of any duty required of him by his contract of employment, but to the contrary, he had started down to the main office after his defense bond, during the rest period, when he was absolutely free to go where he pleased, and at a time when his employer had no control over him. The procuring of this bond by appellant, or the handling of these bonds by Frye & Company, was of no benefit to the employer, and that service was performed by it solely for the convenience of its employees. In the instant case, it further appears that appellant was not paid for the half-hour rest period, and that no premiums or assessments were paid by the employer to the department for the half-hour lunch period.

The *D'Amico* case has definitely established in this state the rules to be followed in determining whether or not an employee is in the course of his employment under our workmen's compensation act.

In the *Purinton* case, *supra,* the opinion, after referring to that part of the opinion in the *D'Amico* case which enumerates the conditions essential to a recovery under the workmen's compensation act, states:

"Following a statement of the facts in that case, the foregoing quoted paragraph was the first legal principle an-

nounced therein by the court in the majority opinion. There can be no doubt that this declaration was deliberately and advisedly made, and was in finality so accepted by those who signed the majority opinion, because, in the dissenting opinion (in which the present writer concurred) the attention of the court was by repetition of the above quotation directed immediately to the effect of the majority holding and to the resultant conflict with the general rule theretofore recognized by us in cases stating that:

" 'It is not essential to the right to receive compensation *that the employee should have been working at the particular time when the injury was received,* also stating that the employment is not limited to the *exact moment when he begins* work or when he quits work.' "

The opinion in the *Purinton* case continues:

"It is thus apparent that in the *D'Amico* case, *supra,* the majority of this court intended to hold, and did specifically declare, that in order *to entitle one to the benefits of the industrial insurance act,* he must, among other essential conditions, be in the *actual performance of the duties required by the contract of employment."* (Italics ours.)

The opinion in the *Purinton* case was concurred in by the writer of the opinion in the *D'Amico* case, so it must be concluded that he agreed with the above-quoted statements.

We have not set out herein any part of the workmen's compensation act, as the applicable statutes are set out in the *D'Amico* case.

In concluding this discussion, it may be stated that reference has been made to the case of *Boeing Aircraft Co. v. Department of Labor & Industries,* 22 Wn. (2d) 423, 156 P. (2d) 640. Certain statements will be found in that case which might seem to be contrary to our conclusions herein, but we think it apparent that the decision in the cited case is not controlling here, as this appellant was not a party to that action, nor was any employee of Frye & Company. There was not, nor could there have been, in the cited case a determination of whether or not an employee of Frye & Company was in the course of his employment at the time he was injured by the plane striking the Frye & Company plant.

■ The trial court, having decided as a matter of law that appellant was in the course of his employment at the time he was injured, did not pass upon the question of whether or not sufficient facts were established by the evidence to take the case to the jury on the question of the claimed negligence of respondent.

In view of the fact that we are of the opinion a new trial must be granted in this case, we have examined the evidence relative to the claimed negligence of the employees of respondent in charge of the B-29, and we are satisfied that such evidence established a *prima facie* case of negligence on the part of respondent. At the time respondent's motion was interposed and granted, appellant was proceeding upon the theory that his action was a common-law action for negligence.

Having concluded that the evidence in the case at this point, under the authority cited, conclusively established that appellant was *not* in the course of his employment at the time he was injured, the provisions of the workmen's compensation act would not have been available to him; and it follows that appellant could not have made a valid election to proceed under that act or accept any of its benefits. We therefore do not deem it necessary, other than as above stated, at this time to discuss the question of whether or not any election was made by appellant, as claimed by respondent, nor do we deem it necessary or proper to discuss any of the other questions raised by respondent which pertain to the workmen's compensation act. In other words, having concluded from the evidence introduced by appellant that he was not in the course of his employment, the workmen's compensation act would have no application to him at this time, and he was entitled to have the case proceed on the theory of a common-law action for negligence.

Of course, we do not desire to be understood as deciding what the ultimate answer may be, either to any legal question presented, or to any factual question, as those questions must be answered as the case proceeds; nor do we mean to limit the issues presented on the new trial.

For the reasons herein assigned, the judgment of the trial court is reversed, and the cause is remanded to the lower court with instructions to grant to appellant a new trial and to proceed in accordance herewith.

BEALS, C. J., MILLARD, BLAKE, and ROBINSON, JJ., concur.

[1]Reported in 172 P. (2d) 222.